UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ERICA MELIA,

                                        Plaintiff,

v.                                                          1:14-CV-00226
                                                            (MAD/TWD)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                        Defendant.
_____

APPEARANCES:                              OF COUNSEL:

BOND, MCDONALD LAW FIRM                   MARK M. MCDONALD, ESQ.
*Counsel for Plaintiff*
91 Genesee Street
Geneva, New York 14456


HON. RICHARD S. HARTUNIAN                 VERNON NORWOOD, ESQ.
United States Attorney for the            Special Assistant United States Attorney
  Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

OFFICE OF GENERAL COUNSEL                 STEPHEN P. CONTE, ESQ.
Social Security Administration            Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the

Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b)

(2013) and Northern District of New York Local Rule 72.3(d). This case has proceeded in

accordance with General Order 18 of this Court which sets forth the procedures to be followed

when appealing a denial of Social Security benefits. Both parties have filed briefs. Oral

argument was not heard. For the reasons discussed below, the Court recommends that Plaintiff's

motion for judgment on the pleadings in this case be granted in part and that the case be

remanded for further administrative proceedings.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is presently thirty-three years old with a birth date of August 26, 1981.

(Administrative Transcript at 13.)[1] Plaintiff completed twelfth grade with a special education

diploma *Id.* Plaintiff's last employment, which ended on June 2, 2007, was as a cashier at a gas

station. (T. at 40, 226, 265.) Plaintiff's prior work history included bus aide, car detailer, deli

worker, sandwich maker, resort cook, and lane attendant. (T. at 261-66.) Plaintiff has alleged

disability due to back pain, learning disability, borderline intellectual functioning, depression,

attention deficit disorder, generalized anxiety, right elbow pain, and foot and knee pain. (T. at

241, 305.)

On July 20, 2011, Plaintiff protectively applied for disability insurance benefits and

supplemental security income, claiming disability beginning June 2, 2007. (T. at 198-205.)

Plaintiff's last date insured, based upon her earnings record, was March 31, 2012. (T. at 64.)

Both applications were initially denied on October 12, 2011. (T. at 83-89.) Plaintiff requested a

hearing before an Administrative Law Judge ("ALJ") on November 2, 2011. (T. at 95.) A video

---

[1] The Administrative Transcript is found at Dkt. No. 8. Citations to the Administrative
Transcript will be referenced as "T" and the page numbers as set forth therein rather than the
numbers assigned by the CF/ECM docketing system.

conference hearing was held before the ALJ on September 5, 2012.  (T. at 7-51.)  Plaintiff was represented at the hearing by her attorney, Mark M. McDonald, Esq.  (T. at 7.)

In her November 26, 2012, Decision, the ALJ denied both of Plaintiff's protectively filed applications. (T. at 64-77.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on December 31, 2013.  (T. at 1-3.)  Plaintiff commenced this timely action in the United States District Court for the Northern District of New York on March 3, 2014.  (Dkt. No. 1.)

## II.    APPLICABLE LAW

### A.    Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2006).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential

3

evaluation process to determine disability.  20 C.F.R. § 416.920(a)(4) (2013).  Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014.)  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

The plaintiff-claimant bears the burden of proof regarding the first four steps.  *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).  If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working.  *Id.* (quoting *Perez,* 77 F.3d at 46).

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts

whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010)[2]; *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citations omitted). If supported by substantial

---

[2] On Lexis, this published opinion is separated into two documents. The first is titled *Roat v. Barnhart*, 717 F. Supp. 2d 241, 2010 U.S. Dist. LEXIS 55442 (N.D.N.Y. June 7, 2010). It includes only the district judge's short decision adopting the magistrate judge's report and recommendation. The second is titled *Roat v. Commissioner of Social Security*, 717 F. Supp. 2d 241, 2010 U.S. Dist. LEXIS 55322 (N.D.N.Y. May 17, 2010). It includes only the magistrate judge's report and recommendation. Westlaw includes both the district court judge's decision and the magistrate judge's report and recommendation in one document, titled *Ross v. Barnhart*, 717 F. Supp. 2d 241 (N.D.N.Y. 2010). The Court has used the title listed by Westlaw.

evidence, the ALJ's findings must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [ALJ's]." *Rosado,* 805 F. Supp. at 153. A reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III. THE ALJ'S DECISION

In her November 26, 2012, Decision, the ALJ first determined that Plaintiff has not engaged in substantial gainful activity since her alleged disability onset date of June 7, 2007. (T. 66.) The ALJ found at step 2 of the sequential evaluation that during the period in question, Plaintiff had the severe impairments of Anxiety, Major Depressive Disorder, Borderline Intellectual Functioning, and degenerative disc disease. *Id.* At step 3, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of an impairment contained in the Listing of Impairments. (T. at 67-68.)

The ALJ then concluded that Plaintiff retained the functional capacity ("RFC") "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), involving lifting, carrying, pushing or pulling 10 pounds frequently and 20 pounds occasionally; occasional ramp and stair climbing; and occasional stooping and crawling; except she is limited to simple, routine tasks and instructions, she can engage in only occasional interaction with other individuals, but never with groups or teams of more than four (4) people. She is restricted to task-oriented jobs, but not at production pace." (T. at 69-70.)

At step 4, the ALJ concluded that Plaintiff is unable to perform any of her past relevant

work.  (T. at 75.)  At step 5, the ALJ applied the Medical-Vocational Guidelines and relied upon the testimony of a vocational expert in determining that considering Plaintiff's age, education, work experience, and RFC, she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  (T. at 76.)  The ALJ then concluded that Plaintiff has not been under a disability from June 2, 2007, through the date of the decision.  *Id.*

## IV.    THE PARTIES' CONTENTIONS

Plaintiff claims that the ALJ erred by (1) making an improper severity determination; (2) improperly rejecting the opinions of an examining psychological consultant and arriving at an improper RFC; (3) failing to properly assess her credibility; and (4) improperly relying upon the vocational expert's testimony.  (Dkt. No. 13 at 8.)[3]

Defendant contends that the ALJ's decision applied the correct legal standards and is supported by substantial evidence, and thus should be affirmed.  (Dkt. No. 14 at 3.)

## V.    ALJ'S SEVERITY DETERMINATION

Plaintiff claims that the ALJ's step 2 severity determination was improper because: (1) the analysis of severity was conflated with the question of duration with regard to Plaintiff's right elbow pain due to epicondylitis; and (2) the failure to find that Plaintiff's learning disability is a severe impairment was based upon an improper assessment of the record and improper failure to consider Plaintiff's borderline intellectual functioning and learning disability as separate impairments.  (Dkt. No. 13 at 22-23.)

---

[3]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system.

### A.     Plaintiff's Right Elbow

At the step 2 of the evaluation, the medical severity of a claimant's impairments is considered. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "Impairments" are "anatomical, physiological, or psychological abnormalities . . . demonstrable by medically acceptable clinical and laboratory techniques." *See* 42 U.S.C. § 423(d)(3). A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* at §§ 404.1520(c), 404.1521, 416.920(c), 416.921. The claimant bears the burden of presenting evidence to establish severity. 20 C.F.R. § 404.1512(c) (2013). A claimant is also required to establish that an impairment has lasted or is expected to last for a continuous period of at least twelve months as a part of the step 2 evaluation. *See Gray v. Astrue*, No. 04 Civ. 3736 (KMW) (JCF), 2009 WL 1598798, at * 5, 2009 U.S. Dist. LEXIS 73435, at * 14 (S.D.N.Y. June 8, 2009) (citing 20 C.F.R. § 416.909)); 42 U.S.C. § 1382c(a)(3)(A).

Although severity and duration are both addressed at step 2 in the evaluation process, they have been found to be separate questions that require separate analyses. *Gray*, 2009 WL 1598798, at * 5. "Courts within this circuit have discerned errors when *statutory* disability-duration analysis is conflated with *regulatory* impairment-severity analysis. Reasoning that an impairment's severity is analytically distinct from its chronological duration, they find legal error when the only basis for a Step 2 non-severity finding is insufficient duration." *Snedeker v. Colvin*, No. 3:13-cv-970 (GTS/ESH), 2015 WL 1126598, at * 4, 2015 U.S. Dist. LEXIS 30822, at * 11 (N.D.N.Y. March 12, 2015) (emphasis in original) (citations omitted); *see also Stadler v.*

*Barnhart*, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006) ("[t]o state that an impairment is not severe because it does not meet the twelve-month requirement . . . is inconsistent with the . . . regulations."); *Gray*, 2009 WL 1598798, at * 5 ("Courts . . . reverse for legal error SSA decisions that inappropriately conflate the analysis of severity with the analysis of duration.").

Plaintiff contends that the ALJ committed error requiring remand by conflating the questions of severity and duration in her step 2 analysis of Plaintiff's elbow impairment. The ALJ wrote:

> The undersigned finds that the claimant's arm/elbow impairment is not severe in that it has not lasted and is not expected to last for twelve continuous months. The evidence reflects that the claimant injured her right arm/elbow in June 2012, resulting in a recurrence of pain radiating to the hand. She had previously undergone surgery on the elbow for epicondylitis in February 2012 and fully recovered within one month. An MRI of the elbow done in July 2012 was "essentially completely normal," showing no evidence of recurrent epicondylitis and physical examination showed no swelling, weakness, sensory disturbance, stiffness or tenderness."

(T. at 67.)

While one could understandably conclude from the language "is not severe as it has not lasted . . . for twelve continuous months," that the ALJ conflated the analysis of severity and duration, the paragraph considered in its entirety reveals that the ALJ considered both the severity of Plaintiff's elbow impairment and the duration. Furthermore, the ALJ's conclusion that there was no objective medical evidence of a severe right elbow impairment is supported by substantial evidence. The July 12, 2012, progress note of Dr. Catherine Shin, whom Plaintiff saw for recurring right elbow pain, noted complaints of pain, no mechanical symptoms, no neurologic symptoms, no swelling or redness, and normal x-ray. (T. at 534-35.) The July 18,

2012, progress note of Physician Assistant Judith A. Baker indicated complaints of continuing pain with no mechanical or neurological symptoms and a referral for an MRI. (T. at 537.) Dr. Shin's August 9, 2012, progress note reveals continuing complaints of pain with no mechanical or neurological symptoms, no swelling, full range of motion, normal grip strength, strong DF/VF, pronation/supination, and light sensation intact on fingers, and "essentially completely normal" MRI. (T. at 540-41.)

Evidence of a claimant's pain and other limiting symptoms are important elements in disability claims and must be thoroughly considered. *See Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (citation omitted). "[A] claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence." *Id.* (quoting *Simmons v. U.S. R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992)). However, "[a claimant's] symptoms, such as pain . . . will not be found to affect [his or her] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. §§ 404.1529(b), 416.929(b). *See also* SSR 96-7p, 1996 WL 374186, at * 1 (July 2, 1996) ("No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.").

The ALJ's determination on severity was supported by substantial evidence showing that Plaintiff's complaints of right elbow pain commencing several months post-surgery were unsupported by objective medical evidence. The medical records also support the ALJ's

determination on duration inasmuch as Plaintiff initially sought medical treatment for a complaint of right elbow pain on October 12, 2011. (T. at 471.) Plaintiff had a right lateral epicondyle release with partial ostectomy on February 15, 2012, and was found to be healing well from the surgery when she saw Dr. Alexander on February 28, 2012. (T. at 510.) Plaintiff had a month of physical therapy following the surgery. (T. at 17.)

Plaintiff testified at her hearing that after the elbow surgery "her arm was feeling fine" until she started helping her father with small paint jobs. (T. at 18.) The testimony is consistent with the history she gave Dr. Shin on July 12, 2012. (T. at 535.) The Court finds that Plaintiff's testimony and the medical records provide substantial evidence for the ALJ's conclusion that her elbow impairment had not lasted continuously for twelve months. As noted above, the only evidence of elbow impairment since Plaintiff began complaining of renewed pain in July of 2012 was her subjective complaints of pain. Therefore, the Court also finds substantial evidence supporting the ALJ's determination that Plaintiff's elbow impairment was not expected to last for a continuous period of twelve months.

In sum, the Court concludes that the ALJ adequately considered both the severity and duration of Plaintiff's elbow impairment at step 2, and that her determination that it was not a severe impairment and did not meet the duration requirements is supported by substantial evidence.

### B. Plaintiff's Learning Disability

Plaintiff contends that the ALJ erred at step 2 by, without explanation, failing to include her learning disabilities as a severe impairment. (Dkt. No. 13 at 21.) According to Plaintiff, a learning disability is an impairment in its own right, and the ALJ erred in treating her learning

disability and borderline intellectual capacity as one impairment. *Id*. at 23; T. at 70. Plaintiff is correct that a diagnosis of learning disability can serve as an additional and significant impairment. *See Williams v. Astrue*, No. 07 Civ 4134 (JGK), 2008 WL 4755348, at * 10, 2008 U.S. Dist. LEXIS 86779, at * 31 (S.D.N.Y. Oct. 27, 2008) ("[A] learning disorder is a separate impairment from borderline intellectual functioning and it was necessary for the ALJ to have determined whether the learning disorder was correctly evaluated and whether it resulted in additional and significant limitations which were in fact different from borderline intellectual functioning" in analyzing whether the claimant had a listed impairment under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05D).

The Court finds that in this case, the ALJ's failure to include learning disability as a distinct severe impairment is understandable because in Claimant's Hearing Memorandum submitted in the hearing before the ALJ, Plaintiff's counsel identified "Borderline intellectual capacity/Learning disorder" as a single impairment in the list of Plaintiff's impairments. (T. at 305.) Furthermore, the failure to identify learning disability as a severe impairment at step 2 in and of itself constituted harmless error because in her subsequent sequential analysis the ALJ addressed both Plaintiff's borderline intellectual capacity and learning disability as required by 20 C.F.R. §§ 404.1523 and 416.923.[4] *See Snedeker,* 2015 WL 1126598 at * 7 ("when functional effects of impairments erroneously determined to be nonsevere at Step 2 are fully considered and factored into subsequent residual functional capacity assessments, a reviewing court can confidently conclude that the same result would have been reached absent the Step 2 error.").

---

[4] The question of whether the ALJ erred in her assessment of Plaintiff's borderline intellectual capacity and learning disorder in determining her RFC is discussed below.

## VI.   ALJ'S RFC ASSESSMENT RELATING TO PLAINTIFF'S BORDERLINE INTELLECTUAL CAPACITY AND LEARNING DISABILITY

### A.   Residual Functional Capacity Generally

A claimant's RFC is the most he can do despite his limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quotations omitted)).

It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.  20 C.F.R. § 404.1546(c).  In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id.* § 404.1545(a).  Age, education, past work experience, and transferability of skills are vocational factors to be considered. *Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).  Physical abilities are determined by evaluation of exertional and nonexertional limitations.  Exertional limitations include claimant's ability to walk, stand, lift, carry, push, pull, reach, and handle.  20 C.F.R. § 404.1569a(b).  Once the ALJ has resolved a claimant's complaints of pain, he can then evaluate exertional and non-exertional limitations. *Lewis v. Apfel*, 62 F. Supp. 2d 648, 658 (N.D.N.Y. 1999).

The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004) (citation omitted). "In assessing RFC, the ALJ's findings must specify the functions a plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Roat*, 717 F. Supp. 2d at 267 (citation omitted). "RFC is then used to determine the particular types of work a claimant may be able to perform." *Whittaker*, 307 F. Supp. 2d at 440.

### B.      Credibility and the RFC

In addition to reviewing the medical evidence in determining the RFC, the ALJ must review the credibility of Plaintiff. The ALJ "is not required to accept the claimant's subjective complaints without question; she or he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2010). "It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dept. of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation and internal punctuation omitted). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. 20 C.F.R. § 404.1529; *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see* SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996). The ALJ is required to consider all of the evidence of record in making the credibility assessment. *Genier*, 606 F.3d at 50 (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)).

First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's

pain or other symptoms."  SSR 96-7p, 1996 WL 374186, at *2.  This finding "does not involve a

determination as to the intensity, persistence, or functionally limiting effects of the claimant's

pain or other symptoms."  *Id.*  If no impairment is found that could reasonably be expected to

produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic

work activities.  *Id.*  An individual's statements about his pain are not enough by themselves to

establish the existence of a physical or mental impairment, or to establish that the individual is

disabled.  *Id.*  Here, the ALJ determined that Plaintiff's medically determined impairment could

reasonably be expected to cause the symptoms alleged by Plaintiff.  (T. at 19.)

Once an underlying physical or mental impairment that could reasonably be expected to

produce the claimant's pain or other symptoms has been established, the second step of the

analysis is for the ALJ to "'consider the extent to which [the claimant's] symptoms can

reasonably be accepted as consistent with other objective medical evidence and other evidence.'"

*Genier,* 606 F.3d at 49 (quoting 20 C.F.R. § 404.1529(a)); *see also Poupore v. Astrue,* 566 F.3d

303, 307 (2d Cir. 2009) (finding that claimant's subjective complaints of pain were insufficient

to establish disability because they were unsupported by objective medical evidence tending to

support a conclusion that he had a medically determinable impairment that could reasonably be

expected to produce the alleged symptoms); *see also* SSR 96-7p, 1996 WL 374186, at *2 ("One

strong indication of the credibility of an individual's statements is their consistency, both

internally and with other information in the case record.").  This includes evaluation of the

intensity, persistence, and limiting effects of the pain or symptoms to determine the extent to

which they limit the claimant's ability to perform basic work activities.  SSR 96-7p, 1996 WL

374186, at *2.

The ALJ must consider all evidence of record, including statements the claimant or others make about his or her impairments, restrictions, daily activities, efforts to work, or any other relevant statements the claimant makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony during administrative proceedings.  *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1512(b)(3)).  A claimant's "symptoms can sometimes suggest a greater level of severity than can be shown by the objective medical evidence alone."  SSR 96-7p, 1996 WL 374186, at *3.  However, when the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors:  (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3)(I)-(vii); 416.929(c)(3)(I)-(vii).

**C.**     **Assessment of Plaintiff's Borderline Intelligence Capacity and Learning Disability in Determining her RFC**

Plaintiff contends that the ALJ's RFC analysis was based upon an inaccurate assessment of the record "because she failed to meaningfully consider the combination of [Plaintiff's] separately diagnosed impairments of a learning disorder and borderline intellectual functioning." (Dkt. No. 13 at 23.)   In support of her argument, Plaintiff notes the ALJ's failure to consider any

of Plaintiff's school records other than an assessment done when she was four years old. *Id*. at 22-23. In her assessment of Plaintiff's borderline intellectual capacity and learning disability, the ALJ discussed a preschool psychological assessment on Plaintiff that had been done when she was four years old. (T. at 70.) The ALJ noted that the assessment indicated Plaintiff exhibited a delay of cognitive abilities of approximately ten months as measured on the Standford-Binet, consistent with intellectual functioning in the low average range. (T. at 70.)

The ALJ thereafter erroneously concluded that there were no other records substantiating the range or scope of Plaintiff's cognitive delay. *Id*. Not considered by the ALJ were notes on Plaintiff's school performance in elementary school at Coxsackie-Athens Central School included in the record, which described her as having weak academics, difficulties staying on task, having such a short attention span that it was often unable to accommodate a ten minute reading lesson, and seldom being able to complete independent activities in kindergarten through second grade. (T. at 276.) Also not considered were notes from fourth and fifth grade, describing Plaintiff as having made steady progress. Improvements were noted in her reading, vocabulary, math, attention span, and some improvement in completing independent work, although she continued to have problems staying focused on task and needed a lot of supervision to finish her work. *Id*.

The ALJ also failed to consider Plaintiff's Individualized Education Program ("IEP") for the school year 1999-2000 (eleventh grade) at Coxsackie-Athens Central School, which identified Plaintiff as learning disabled, recommended a self-contained special education class as the least restrictive environment for her, and recommended an IEP diploma. (T. at 215, 217.) The IEP showed that testing revealed a ninth grade reading level and fifth grade equivalent for

math.  *Id*. at 216.  Testing modifications included extending time by "1.5x," having test directions and tests read to her, and providing math tables.  *Id.*  at 215.  Plaintiff testified that she completed twelfth grade and received a special education diploma in 2000.  (T. at 13.)

20 C.F.R. § 404.1520 requires the ALJ to "consider all evidence in [a claimant's] case record" when making a determination or decision on disability.  The ALJ without question failed to consider a large part of Plaintiff's school records in her RFC assessment.  The Second Circuit has remanded cases where it appears that the ALJ has "failed to consider relevant and probative evidence which is available to him [or her]."  *Lopez v. Sec'y of Dept. of Health and Human Services*, 728 F.2d 148, 150-51 (2d Cir. 1984).  However, the Court finds that in this case, the ALJ's failure to consider Plaintiff's elementary school notes and eleventh grade IEP constitutes harmless error.  *See Seltzer v. Commissioner of Social Sec.*, No. 07-CV-0235 (CBA), 2007 WL 4561120, at * 10 , 2007 U.S. Dist. LEXIS 92778, at * 26 (E.D.N.Y. Dec. 18, 2007) (court can affirm the ALJ's decision when the ALJ fails in his or her duty to consider all of the relevant evidence if the error is deemed harmless).

The ALJ determined that Plaintiff's RFC was limited to "simple, routine tasks and instructions" and is "restricted to task-oriented jobs, but not at production pace."  (T. at 69.) Based upon a review of the evidence, the Court concludes that the ALJ's RFC determination is supported by substantial evidence with regard to Plaintiff's borderline intellectual capacity and learning disability.

In addition to Plaintiff's pre-school testing, the ALJ considered the September 27, 2011, consultative psychiatric evaluation of Plaintiff done by Christine Ransom, Ph.D. ("Dr. Ransom") upon referral by the State Bureau of Disability Determination with respect to Plaintiff's

borderline intellectual capacity and learning disability. (T. at 444-47.) Dr. Ransom noted that while Plaintiff's expressive and receptive skills were simplified, they were adequate to complete her evaluation without difficulty. (T. at 45.) Dr. Ransom determined that although Plaintiff's examination revealed moderate impairments in attention, concentration, and memory due, in part, to her limited intellectual capacity, she could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, and learn simple new tasks. (T. at 446.)

The ALJ also considered the April 27, 2012, consultative psychological evaluation of Christa Dinolfo, Psy.D. ("Dr. Dinolfo"), who examined Plaintiff at the referral of her representative's office and administered the Wechsler Adult Intelligence Scale Fourth Edition (WAIS-IV) as a part of her evaluation. (T. at 71-72.) The ALJ, without any explanation, referred to Dr. Dinolfo's testing as "cursory," and with regard to the WAIS-IV noted in her Decision only that Plaintiff's performance on the WAIS-IV was commensurate with low average intellectual functioning based on her full scale IQ of 80. (T. at 71-72.) The ALJ made no mention of the Plaintiff's Verbal Comprehension Index score of 78 (borderline range); her Perceptual Reasoning Index score of 100 (average range); her Working Memory Index of 74 (borderline range); and Processing Speed Index of 81 (low average range). (T. at 515.)

In her evaluation summary, Dr. Dinolfo noted that the "large discrepancy between nonverbal and verbal abilities [in Plaintiff's WAIS-IV scores] is often found in individuals with Learning Disorders." (T. at 516.) Dr. Dinolfo concluded that compared to scores in the general population, Plaintiff's profile suggested significant weaknesses in understanding vocabulary terms, abstract verbal reasoning, and her ability to hold numeric information in her short-term

19

memory while manipulating it and recalling it.  (T. at 516.)

In Dr. Dinolfo's Evaluation of the Residual Functional Capacity of the Mentally Impaired Patient done on Plaintiff, she rated Plaintiff's ability to comprehend and carry out simple instructions as poor due to the Verbal Comprehension Index of 78 (borderline) on the WAIS-IV testing.  (T. at 518.)  Without explanation, Dr. Dinolfo also rated Plaintiff's abilities to function independently on a job and to sustain concentration and attend to a task for an eight hour period as poor.  (T. at 519.)  The ALJ gave greater evidentiary weight to Dr. Ransom's opinion that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, and maintain attention and concentration for simple tasks, and learn simple new tasks than to that of Dr. Dinolfo in part because there was little evidence to support the degree of Plaintiff's difficulties in assessed by Dr. Dinolfo in her RFC evaluation.  (T. at 72.)  *See Monguer v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (a consultative physician's opinion may serve as substantial evidence in support of an ALJ's decision); *see also* 20 C.F.R. § 404.1546(c) (it is the ALJ's responsibility to determine a claimant's RFC and to not simply agree with a medical source's opinion").

Based upon its review of the evidence, the Court concludes that the ALJ's assessment does not reflect a legally erroneous consideration of the appropriate weight to be accorded the opinions of consultative psychologists Dr. Ransom and Dr. Dinolfo with regard to Plaintiff's borderline intellectual capacity and learning disability.  Plaintiff's past work experience includes bus aide, car detailer, deli worker, resort cook, and lane attendant.  (T. at 37-40, 261-66.) Plaintiff was also a volunteer firefighter from 1999 to 2003, during which time she became CPR certified.  (T. at 30.)  Plaintiff's admitted daily activities include taking care of her young

daughter, driving a car, cooking, house cleaning, laundry, and shopping. (T. at 16, 23, 27.)

Plaintiff's past work and her daily activities support Dr. Ransom's opinion as to her capability to

follow and understand simple directions and instructions, perform simple tasks independently,

maintain attention and concentration for simple tasks, and learn simple new tasks. (T. at 446.)

While Plaintiff testified she lost her job at a sandwich shop because she was too slow a learner

(T. at 36), she did not identify any other employment she had lost for that reason.

Furthermore, the Court finds that the ALJ's failure to consider Plaintiff's elementary and

high school records could not reasonably lead to a different conclusion with regard to Plaintiff's

ability to perform simple routine tasks and instructions. *See Johnson v. Bowen*, 817 F.2d 983,

986 (2d Cir. 1987) ("where application of the correct legal principles to the record could lead to

only one conclusion, there is no need to require agency reconsideration.") Those records do not

assess the impact of Plaintiff's borderline intellectual capacity and learning disability subsequent

to her junior year in high school, and they add nothing to the record that suggests consideration

of the records by the ALJ might lead to a different outcome.

Based upon the foregoing, aside from the ALJ's harmless error in failing to consider all of

Plaintiff's school records, the Court finds no error in her assessment of Plaintiff's borderline

intellectual capacity and learning disability.

## VII.    ALJ'S RFC ASSESSMENT RELATING TO PLAINTIFF'S MENTAL IMPAIRMENTS

The ALJ determined that Plaintiff has the severe impairments of Anxiety and Major

Depressive Disorder. (T. at 66.) She determined that Plaintiff's RFC was limited to "simple,

routine tasks and instructions, [engaging] in only occasional interaction with other individuals,

but never with groups or teams of more than four (4) people, [and] restricted to task-oriented jobs, but not at production pace." (T. at 69.) Plaintiff contends that the ALJ improperly assessed the opinions of Drs. Ransom and Dinolfo regarding her mental impairments and, as a result, arrived at an improper RFC. (Dkt. No. 13 at 24-32.) For the reasons explained below, the Court concludes that the ALJ committed legal error in her determination of Plaintiff's RFC as it relates to Plaintiff's Anxiety and Major Depressive Disorder and that certain of her findings are not supported by substantial evidence.

### A. Treatment History of Plaintiff's Anxiety and Major Depressive Disorder

Plaintiff was admitted to Samaritan Hospital with postpartum depression on June 19, 2008, six weeks after the birth of her daughter. (T. at 524.) Plaintiff had no prior history of depression, although she noted some depression during childhood. *Id*. During her hospitalization, Plaintiff was found to be alert and oriented, her thoughts organized, mood depressed, affect sad, tearful and anxious, and admitting to suicidal ideation. (T. at 525.) Plaintiff was diagnosed with "Major depression with similar episodes severe without psychotic features." *Id*.

Plaintiff's Psychiatric Discharge Summary, dated June 25, 2008, revealed a diagnosis of "Major depression, severe, recurrent." (T. at 531.) Plaintiff's mental status examination at discharge showed her to be alert and oriented, her thoughts to be organized, her mood depressed, affect sad, tearful, and anxious. (T. at 531-32.) Plaintiff was noted to have shown an excellent response to Lexapro and Remeron, with an improvement in her sleeping, anxiety, and mood. *Id*. Plaintiff's attention and concentration were noted to be fair, her short-term, recent and remote memories adequate, and her insight and judgment good. *Id*. At the time of discharge, Plaintiff

22

was compliant with medications and behaviorally stable. *Id*.

Plaintiff's medical records show no other treatment for her depression or anxiety. (T. 31, 323-541.) Plaintiff's records from the Columbia Greene Bone & Joint Center from February though October of 2009 reveal that she self-reported depression. (T. 324, 332, 334, 336, 338, 342, 344-45, 347-48.) However, the records do not show that Plaintiff was taking medication for depression or anxiety. *Id*. A Health History from the Rochester General Health System, dated December 15, 2010, includes depression and nervousness among Plaintiff's self-reported symptoms but does not list medication for either one in the list of medications currently being taken. (T. at 424.) Records from Plaintiff's primary care physician, Dr. Ernesto Santana, from October and November, 2011, regarding Plaintiff's right elbow pain, do not list any medications for depression or anxiety among Plaintiff's current medications. (T. at 471-476.) There is no indication in Plaintiff's medical records that subsequent to her hospitalization for postpartum depression in 2008, any of her treating physicians recommended that she seek treatment for depression or anxiety.

### B. Plaintiff's Testimony

At her hearing, Plaintiff testified that she stopped working at her last job as a cashier at a gas station because her anxiety made it hard for her to deal with a lot of people at once. (T. at 13.) Plaintiff testified that she had not gone back to mental health treatment for about four years because she was nervous about seeing anyone for mental health issues because some mental health care providers judged her, and because it is hard for her to explain to people how she feels. (T. at 19-22.) Plaintiff indicated at the hearing that her depression eased from the postpartum depression, and that she had learned to control it a bit, but it was still hard at times. (T. at 24.)

Plaintiff described her anxiety symptoms as hyperventilating, sweating, feeling hot, and crying. (T. at 29.) According to Plaintiff, her anxiety is triggered by having a lot of people around her. *Id*. She starts feeling nervous when there are ten to fifteen people around her and starts to panic. *Id*. Plaintiff does fine with groups of four to five people, although gets very nervous and scared when she is around people she doesn't know. (T. at 30, 35-36.) Plaintiff testified that she usually has anxiety attacks about once a week. (T. at 35.) Plaintiff indicated that the last time she had an anxiety attack was a few days before the hearing. (T. at 34.) It was caused by everything that was going on. She was sitting with members of her daughter's father's family and started panicking. *Id*. Her anxiety attacks last around fifteen minutes. *Id*. According to Plaintiff, her anxiety attacks have become worse since December of 2011. (T. at 35.) Plaintiff testified that she was taking medication for her depression and anxiety at the time of the hearing. (T. at 22.)

### C. Dr. Ransom's Consultative Examination Regarding Plaintiff's Anxiety and Depression

The history recited in Dr. Ransom's psychiatric evaluation indicates that Plaintiff was treated with Zoloft after her hospitalization for postpartum depression and could not recall how long she continued taking the medication. (T. at 444.) Plaintiff was not receiving treatment for her depression as of the time of her examination. *Id*. Plaintiff reported frequent depression and current difficultly falling asleep with frequent waking during the night. *Id*. She also reported reduced appetite, occasional crying, no irritability, adequate energy level, and difficulty concentrating. *Id*. Plaintiff told Dr. Ransom that her interaction with her family was limited to phone calls, that she had some friends, and that she spent most of her time taking care of her

daughter.  (T. at 444-45.)  Plaintiff reported constantly feeling anxious for as long as she could remember, worrying about everything, and being very tense in crowds.  (T. at 445.)  However, Plaintiff denied panic attacks, manic symptomatology, thought disorder, cognitive symptoms, and deficits other than a learning disorder.  *Id*.  Plaintiff denied a history of drugs and alcohol, as she had with many of her health care providers over the years, although there is evidence in the record of Plaintiff's regular use of marijuana since the age of thirteen.  (T. at 324, 362, 393, 445, 513, 524.)

Dr. Ransom's mental status examination of Plaintiff revealed that her speech was slow and halting, and both her speech and affect were moderately dysphoric and moderately tense during the evaluation.  (T. at 445.)  Dr. Ransom found Plaintiff's thought processes to be coherent and goal directed with no evidence of hallucinations, delusions, or paranoia during the evaluation.  *Id*.  Plaintiff's attention and concentration were found to be moderately impaired.  (T. at 446.)  Dr. Ransom noted that Plaintiff's attention and concentration appeared to be impaired by depression, anxiety, and limited intellectual capacity.  *Id*.  Dr. Ransom also found Plaintiff's immediate and recent memory to be moderately impaired.  *Id.*  Plaintiff was able to remember one out of three objects immediately and three digits forward and two backward.  *Id*.  She could recall one of three objects after five minutes.  *Id.*  Plaintiff's remote memory was found to be intact.  *Id*.  Dr. Ransom opined that Plaintiff's memory functions appeared to be impaired by depression, anxiety and limited intellectual capacity.  *Id*.

Dr. Ransom found that Plaintiff was able to dress, bath and groom herself; cook and prepare food; do cleaning, laundry and shopping; manage money; and drive a car.  (T. at 446.)  Dr. Ransom noted that Plaintiff socialized with friends and family by phone, and spent most of

her time at home caring for the needs of her child.  *Id.*  Dr. Ransom's evaluation revealed that Plaintiff avoided leaving the house and she becomes intensely nervous around crowds.  *Id.*

As noted above, Dr. Ransom concluded that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a regular schedule, and learn simple new tasks.  *Id.* However, Dr. Ransom found that Plaintiff would have moderate difficulty performing complex tasks, relating adequately with others and appropriately dealing with stress due to major depressive disorder currently moderate, generalized anxiety currently moderate, and probable borderline intellectual capacity.  *Id.* at 446-47.  Dr. Ransom found the results of the evaluation to be consistent with Plaintiff's allegations.  *Id.* at 447.

Dr. Ransom recommended that Plaintiff resume treatment for depression and anxiety and opined that with treatment, Plaintiff's prognosis was fair to good as to her depression and anxiety.  *Id.*

### D.      Dr. Dinolfo's Consultative Examination Regarding Plaintiff's Anxiety and Depression

#### 1.      Background

As noted above, Dr. Dinolfo examined Plaintiff at her representative's request on April 27, 2012.  (T. at 512-17.)  Dr. Dinolfo reviewed the cognitive evaluation done on Plaintiff in 1985, her eleventh grade IEP, and Dr. Ransom's evaluation.  (T. at 512.)  In her evaluation, Dr. Dinolfo reported that Plaintiff recalled experiencing significant depression and anxiety beginning at age thirteen.  (T. at 513.)  Plaintiff began smoking marijuana every other night when she was thirteen and continued to do so as of her examination because she believed it helped her sleep.

*Id.* Plaintiff reported engaging in cutting from around thirteen years old until she was eighteen and again when she was experiencing postpartum depression in 2008. (T. at 513, 515.)

Plaintiff reported working three jobs at the same time between the ages of twenty and twenty-two. *Id.* However, she subsequently became homeless for three or four months during which time her anxiety drastically increased. *Id.* Plaintiff thereafter began to experience increased difficulties in the workplace and was fired from a sub shop after a month because she didn't make the subs quickly enough. (T. at 514.) Plaintiff told Dr. Dinolfo that her next full time job in 2007 was at a gas station, where she experienced significant anxiety and asked her manager to make sure she was not scheduled alone on shifts. *Id.* According to Plaintiff, she had a panic attack at work while working alone and quit shortly thereafter. *Id.* Plaintiff had told Dr. Ransom that she left her job because her employer would not give her enough hours. (T. at 444.) Plaintiff expressed significant anxiety and discomfort regarding employment opportunities because "People just don't like how I learn things slowly. It's hard to find a job where people will deal with people like me." *Id.* Dr. Dinolfo noted that Plaintiff had suffered from postpartum depression after the birth of her daughter in 2008. (T. at 514.) Plaintiff informed Dr. Dinolfo that she continued seeing a therapist for approximately two and one-half months after being hospitalized and stopped because she was feeling better. *Id.* Plaintiff acknowledged she had not participated in counseling since 2008. *Id.*

Although Plaintiff told Dr. Dinolfo she had an appointment scheduled through Wayne Behavioral Center for May 15, 2012, Plaintiff's subsequent hearing testimony indicated she had not had mental health treatment since 2008. (T. 514.) According to Plaintiff, her primary care physician, Dr. Santana, had prescribed Celexa 20 mg. approximately three weeks before her

evaluation by Dr. Dinolfo. *Id.*

2.  Mental Status Examination

Dr. Dinolfo reported that rapport was easily established with Plaintiff throughout the evaluation. (T. at 514.) Plaintiff's mood was dysphoric, her affect restricted, and she seemed extremely anxious as evidenced by her shallow breathing and tense posture and her own acknowledgment that she was feeling extremely anxious. *Id.* Plaintiff became tearful during the intelligence assessment and discussions of her family, particularly her daughter. (T. at 515.) Plaintiff described experiencing chronic anxiety increasing in severity and frequency over the past few years. *Id.* She reported symptoms of panic attacks and told Dr. Dinolfo that her last major panic attack had occurred around December of 2011. *Id.* Plaintiff informed Dr. Dinolfo that she experienced significant symptoms of anxiety approximately one to two times a week, particularly when she left home, causing her to try to stay at home. *Id.* Plaintiff also described an ongoing depressed mood since childhood with crying spells, low energy, low self-esteem, hopelessness and social withdrawal. *Id.* Plaintiff told Dr. Dinolfo that there are times she wants to give up but cannot because of her daughter who is number one on her mind. *Id.* Plaintiff endorsed visual and auditory experiences that might be hallucinations consistently over the past three or four years for which there is no other evidence in the record. *Id.*

3.  Millon Clinical Multiaxial Inventory-III ("MCMI-III")

Dr. Dinolfo noted that the results of the MCMI-III showed no patterns of inconsistent response and limited evidence of over-reporting of symptoms by Plaintiff, which she indicated should be interpreted with caution as Plaintiff's response style conveyed feelings of extreme vulnerability, also associated with a current episode of acute turmoil. (T. at 516.) According to

Dr. Dinolfo, Plaintiff's profile revealed clinically significant symptoms of depression and anxiety highlighted by social discomfort, self-doubts, and thoughts of suicide.  *Id*.

### 4.    Evaluation Summary

Dr. Dinolfo concluded that based upon available medical records, self-reporting in the interview and her report of symptoms on the MCMI-III, Plaintiff currently experienced significant depression and anxiety, characterized by longstanding sadness, social discomfort, panic symptoms, suicidal ideation, and a history of self-harm.  *Id*.  Dr. Dinolfo found that the results of the evaluation supported much of the findings of Plaintiff's previous records, which suggested she currently exhibited symptoms of Major Depressive Disorder and Generalized Anxiety Disorder.

Dr. Dinolfo described Plaintiff's clinical presentation as somewhat challenging to clarify due to her ongoing substance abuse and possible dependence.  (T. at 517.)  Dr. Dinolfo noted that given that Plaintiff began her substance abuse in her teenage years at the same time her symptoms of depression and anxiety began, it was unclear whether or not her substance abuse and possible dependence was causing her psychiatric symptoms or vice versa.  *Id*.  Dr. Dinolfo concluded that Plaintiff had experienced moderate to intense psychiatric symptoms and significant substance abuse and possibly dependence throughout the majority of her lifetime and recommended that Plaintiff participate in long-term out-patient treatment addressing both her psychiatric symptoms and substance abuse, along with ongoing medication.  *Id*.

### 5.    Dr. Dinolfo's Evaluation of Plaintiff's Residual Functional Capacity

Dr. Dinolfo found Plaintiff's ability to maintain social functioning    ability to get along with others and communicate effectively    to be poor.  (T. at 520.)   Pointing to the report of

previous employment experiences in her evaluation, Dr. Dinolfo opined that Plaintiff's condition was likely to deteriorate if she was placed under stress, especially the stress of a job, that her impairments were likely to produce "good days" and "bad days," and that she was likely to miss more than four days per month as a result of her mental impairments. (T. at 521.) Dr. Dinolfo concluded that given the extent of symptoms of Plaintiff's anxiety and depression, it was likely that being at the work site would distress her and possibly cause physical discomfort given her back problems. *Id.*

### E. ALJ's RFC Assessment Relevant to Plaintiff's Anxiety and Depression

#### 1. Errors in Weighing of Dr. Dinolfo's Opinion

The ALJ gave greater weight to Dr. Ransom's opinion than that of Dr. Dinolfo in determining the impact of Plaintiff's anxiety and depression on her RFC. (T. at 72.) Her stated rationale for doing so was that Dr. Ransom's opinion was not an exaggeration of Plaintiff's symptoms and was consistent with her activities of daily life and work history. (T. at 73.) The ALJ also assumed bias on Dr. Dinolfo's part because she had examined Plaintiff at the request of Plaintiff's representative. (T. at 72.) However, "the mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of a report." *Gunter v. Comm'r of Social Security*, 361 F. App'x 197, 198 n.2 (2d Cir. 2010) (quoting *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998)).

The ALJ found Dr. Dinolfo's opinion to be entitled to less weight in part because other

than "cursory testing,"[5] Dr. Dinolfo's opinion relied heavily on the subjective report of symptoms, history and limitations provided by Plaintiff, and there was no documentary support for the severity of Plaintiff's reported symptoms because she had not participated in outpatient mental health treatment or required treatment in an acute care setting or hospital since 2008.[6] (T. at 72.)

An ALJ is permitted to consider a Plaintiff's failure to seek treatment for alleged disabilities when evaluating a Plaintiff's credibility with respect to statements of the extent of impairments. *See Miller v. Colvin*, No. 13-CV-6512 EAW, 2015 WL 628359, at * 12, 2015 U.S. Dist. LEXIS 17689, at *32 (W.D.N.Y. Feb. 12, 2015). However, the Second Circuit has noted that a claimant's refusal or inability to obtain treatment for a mental illness is not necessarily probative of the severity of the individual's disability. *De Leon v. Secretary of Health and Human Servs.*, 734 F.2d 930, 934 (2d Cir. 1984); *see also Regennitter v. Comm'r of the Social Security Adm.*, 166 F.3d 1294, 1299-1300 (9th Cir. 1999) ("Indeed, we have particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is

---

[5] The ALJ gave no explanation as to why she considered Dr. Dinolfo's testing to be cursory and what weight, if any, she gave to the results of the testing in assessing Plaintiff's anxiety and depression.

[6] The considerable weight the ALJ gave to Plaintiff's failure to participate in mental health treatment since 2008 is reflected in the number of times she referenced the Plaintiff's lack of treatment in her assessment of the impact of depression and anxiety on her RFC. *See, i.e.*, ("There is no further evidence that the claimant has received either inpatient or outpatient mental health treatment since 2008." (T. at 70); "There is no documentary support for the presence or severity of these reported symptoms because the claimant has not participated in outpatient mental health treatment and has not required treatment in an acute care setting or hospital since 2008. " (T. at 72); "Certainly, the claimant has not had mental health treatment in years." *Id*.; "In addition, despite her allegations that she is experiencing worsening panic attacks and anxiety, no physician apparently has referred the claimant for mental health treatment, the emergency room, or crisis care for depression or anxiety." *Id*.

notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" (quoting *Nguyen [v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)); *Clark v. Astrue*, No. 08 Civ. 10389(LBS), 2010 WL 3036489, at * 5, 2010 U.S. Dist. LEXIS 78479, at * 14-15 (S.D.N.Y. Aug. 4, 2010) ("lack of treatment [should not be used] to reject mental complaints both because mental health is notoriously underreported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation") (citations and internal quotation marks omitted).

A ruling issued by the Commissioner provides that an "adjudicator must not draw any inferences about an individual's symptoms and functional effects from a failure to seek out or pursue medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits, or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186 (July 2, 1996).

When questioned at the hearing regarding her failure to seek mental health treatment for the past few years, Plaintiff testified that she was nervous about mental health care providers because some of them judged her because of her disability and it was hard for her to explain to people how she feels. (T. 19-20.) There is no indication in the Decision that the ALJ gave any consideration to Plaintiff's explanation as to why she had not sought mental health care. In addition, the ALJ failed to take into account whether poor judgment resulting from Plaintiff's mental impairments or her borderline intellectual functioning contributed to her failure to obtain mental health treatment. *See Kennerson v. Astrue*, No. 10-CV-6591 (MAT), 2012 WL 3204055, at * 13, 2012 U.S. Dist LEXIS 109158, at * 38 (W.D.N.Y. Aug. 3, 2012) (ALJ erred in failing to

take plaintiff's borderline intellectual functioning which was a likely contributor in her failure to continue mental health care, into account); *Clark,* 2010 WL 3036489, at * 5.

2.      Assessment of Plaintiff's Credibility

The ALJ found Plaintiff's testimony regarding her mental limitations to be less than credible because her testimony contained some inconsistencies.[7] (T. at 72-73.)   More specifically, the ALJ questioned Plaintiff's testimony that she stopped working due to anxiety and trouble dealing with multiple people at once and has experienced a worsening of panic attacks because Plaintiff stated that she enjoys taking her daughter to play in the park, goes for walks for exercise, enjoys spending most of her day outside, goes to the grocery store, and enjoys sitting on her porch watching people walk and drive by.  (T. at 73.)  The ALJ reasoned that all of those activities would place Plaintiff in public surroundings where she would potentially encounter large groups of people.  *Id.*

The ALJ is required to consider all evidence in making a credibility assessment.  *Genier*, 606 F.3d at 50.  Furthermore, although an ALJ is entitled to resolve conflicts in the evidentiary record, she or he cannot pick and choose only evidence that supports a particular conclusion.  *See Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing *Fiorello v. Heckler*, 725 F.2d 174,175-76 (2d Cir. 1983)).  While relying on testimony that Plaintiff enjoys taking her daughter to the park to challenge Plaintiff's credibility, the ALJ failed to acknowledge Plaintiff's testimony that she tried to take her daughter to the park when "there's a little bit of people" and

_____

[7] The ALJ also challenged Plaintiff's credibility based upon her failure to seek mental health treatment, which as discussed above, constituted error given the ALJ's failure to consider Plaintiff's articulated reasons for failing to seek treatment and the impact her mental health impairments and borderline intellectual capacity might have had on her not seeking treatment.

also that she took her daughter out in the yard to play.  (T. at 15.)  Plaintiff testified that she liked

to spend most of her days outside, but she gave no testimony from which it could be inferred that

she spent time in areas where she would likely encounter large groups of people.  (T. at 27.)

Plaintiff testified that she goes shopping but explained that she went maybe once a week, usually

had someone go with her because of her anxiety, and that it bothered her to go into the stores.

(T. at 29, 32.)  Plaintiff testified only that she had sat on the porch and watched people drive and

walk by at the place she had stayed when she had come to town the day before the hearing.  (T. at

28.)

   The ALJ concluded that there was no evidence that Plaintiff's claimed mental

impairments significantly impacted her daily activities.  (T. at 73.)  However, Dr. Ransom, whose

opinion was given great weight by the ALJ, found that Plaintiff became intensely anxious around

crowds and avoided leaving the house.  (T. at 446.)  Dr. Dinolfo likewise noted that because of

her significant symptoms of anxiety, particularly when she left home, Plaintiff tried to stay at

home.  (T. at 515.)

     3.  ALJ's Erroneous Finding Regarding Plaintiff's Medication

   The ALJ's finding that the record reflected that Plaintiff was adequately maintained on

anti-depressant and anxiety medications provided by her primary care physician is not supported

by the evidence.  (T. at 73.)  The ALJ cites to Exhibits 12F-14F in support of her finding.

Exhibit 12F is an October 29, 2011, office note from Dr. Seung Hur regarding Plaintiff's right

foot pain of four days duration, and it includes no information regarding medications for anxiety

or depression.  (T. at 467.)  Exhibit 13F is a November 12, 2011, office visit note by Dr.

Thambirajah regarding Plaintiff's painful finger tip, and it contains no information regarding

medications for anxiety or depression. (T. at 469.) Exhibit 14F is an October 12, 2011, office note by Dr. Santana regarding Plaintiff's right elbow pain. (T. at 471.) It lists medications being taken by Plaintiff as Flexeril, Ibuprofen, Norco, Norflex, Prilosec, birth control pills, and Chantix. *Id.* There is nothing in the note regarding medication for depression or anxiety.[8]

The Court has found no evidence in the record supporting the ALJ's finding regarding medication. Plaintiff's medical records do not reflect that she was taking medication for anxiety and depression subsequent to her hospitalization for postpartum depression. Dr. Ransom's September 27, 2011, evaluation reveals that Plaintiff was receiving no current treatment for depression. (T. at 444.) Dr. Dinolfo's May 4, 2012, evaluation indicates that Plaintiff had been prescribed Celexa by her primary care physician only three weeks before her evaluation. (T. at 514.)

Nor is there evidentiary support for the ALJ's finding that Plaintiff's depression and anxiety were adequately maintained. Plaintiff reported to Dr. Ransom feeling frequently depressed and constantly feeling anxious and very tense around crowds; Dr. Ransom found Plaintiff to be moderately dysphoric and tense, and diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder that were currently moderate. (T. at 444-47.) Plaintiff's profile as shown in the results of the MCMI-III administered by Dr. Dinolfo revealed clinically significant symptoms of depression and anxiety highlighted by social discomfort. (T. at 516.) Dr. Dinolfo concluded that Plaintiff currently exhibited symptoms of Major Depressive Disorder and Generalized Anxiety Disorder. (T. at 17.) Plaintiff testified at her hearing that her

---

[8] The Court reviewed Exhibits 12E-14E to determine if the ALJ had made an error in citing to the exhibits. (T. at 289-91.) None deal with medication for depression and anxiety.

depression had eased some since her hospitalization for postpartum depression, but she was having anxiety attacks about once a week and was very nervous around people she did not know and groups of people. (T. at 24, 29-30, 35-36.)

4.    Conclusion

The Court finds that the ALJ committed legal error in assuming bias on Dr. Dinolfo's part because she evaluated Plaintiff at the request of Plaintiff's counsel. The Court further finds that the ALJ committed legal error in giving little weight to Dr. Dinolfo's opinions and in questioning Plaintiff's credibility based upon Plaintiff's failure to seek mental health treatment, without considering the Plaintiff's explanation for her failure to seek treatment and the impact poor judgment resulting from her mental health impairments and borderline intellectual capacity may have had on the failure.

In addition, the Court finds that the ALJ erred in her assessment of Plaintiff's credibility by failing to consider the entirety of Plaintiff's testimony as it related to activities that could potentially involve contact with the public, as well as Drs. Ransom and Dinolfo's consistent findings that Plaintiff avoided leaving home because of anxiety and discomfort around groups of people. The Court also finds that the ALJ's determination that Plaintiff was adequately maintained on medications for depression and anxiety is not supported by substantial evidence.

VIII.  **ALJ'S RFC ASSESSMENT RELATING TO PLAINTIFF'S DEGENERATIVE DISC DISEASE**

A.      **Plaintiff's Medical Records Regarding her Low Back Pain**

Plaintiff was seen for low back pain by Dr. William Browne on January 30, 2009. (T. at 362.) Dr. Browne's notes indicate that Plaintiff was in two motor vehicle accidents, one in 2000

and the other in 2004, injuring her lower back and suffering from back pain off and on since that time. *Id*. Plaintiff reported that her back pain had become worse when she was shoveling snow two weeks earlier. *Id*. Plaintiff complained of pain ranging from a 5 to a 9/10 and of pain with movement and difficulty caring for her daughter. *Id*. Plaintiff was found to have pain in the lumbosacral area, increased with flexion and extension, and pain that radiated down her left leg. (T. at 363.) Plaintiff was assessed with chronic low back pain, possibly secondary to a herniated disc, Tramadol was prescribed, and an MRI was ordered. *Id.*

An MRI was done on February 3, 2009. (T. at 369.) The MRI showed a slight retrolisthesis of L4 on L5, a mild desiccation at L3-4 and L4-5, and minimal disc space narrowing at L4-5. *Id*. A minor disc bulge and mild facet hypertrophy with no significant central canal or foraminal stenosis was found at L4-5 and a mild facet hypertrophy without significant central canal or foraminal stenosis was found at L5-S1. *Id*. The impression was a mild spondylosis without significant central canal or foraminal stenosis at L4-5 and L5-S1 and no evidence of a focal disc herniation at any level. *Id*.

Records from the Columbia Greene Bone & Joint Center reveal that Plaintiff was seen for center low back pain with pain down the left leg on February 18, 2009, by referral from Dr. Browne. (T. at 324.) Plaintiff complained that nothing had worked to alleviate the pain and holding her daughter and bending over aggravated her back. *Id*. The pain was unaccompanied by neurological symptoms. *Id*. Plaintiff was assessed with intervertebral disc degeneration lumbar and lumbago. *Id*.

Plaintiff was also seen at the Columbia Greene Bone & Joint Center for low back pain on September 10, 2009. (T. at 344.) Plaintiff again complained that nothing alleviated the pain, and

again were no neurological symptoms. *Id.* Plaintiff reported joint stiffness and pain and trouble walking. *Id.* Plaintiff walked with a normal gait, was able to bend at the waist to about the knees, had extension to neutral, was able to heel and toe walk with good gait, negative straight leg raising, and manual motor testing 5/5. (T. at 345.) Medications being taken by Plaintiff at that time included Medrol Dosepak 4, Ibuprofen 600 mg., and Norco 5-325 mg. (T. at 344.) Plaintiff was assessed with lumbago and referred for pain management. (T. at 345-46.)

Plaintiff saw Dr. Tomasz Andrejuk for pain management on October 15, 2009. (T. at 350-54.) Plaintiff was reported to be taking hydrocodone. (T. at 351.) Dr. Andrejuk's examination revealed tenderness in the lumbosacral area, positive lumbar facet related pain, negative straight leg raises bilaterally and not exacerbated by dorsiflexion, normal gait, normal heel and toe walking, and normal tandem walking. (T. at 353.) Dr. Andrejuk assessed Plaintiff with lumbar facet syndrome, lumbar radiculopathy on the left by history, and degenerative disc disease. *Id.* His treatment plan included scheduling Plaintiff for bilateral lumbar medial branch blocks, considering lumbar epidural steroid injections at L5-S1, referring Plaintiff to physical therapy once her pain was better controlled, and a tens unit for trial. (T. at 354.)

When Plaintiff was seen again at the Columbia Greene Bone & Joint Center on October 22, 2009, her chief complaint was low back pain. (T. at 347.) Plaintiff again claimed that nothing alleviated her pain. *Id.* Her current medications were listed as including Mobic 15 mg., Medrol Dosepak 4 mg., Ibuprofen 600 mg., and Norco 5-325 mg. *Id.* Plaintiff's spinal exam was consistent with that of September 10, 2009. (T. at 348.)

Plaintiff's medical records do not reflect ongoing treatment for her low back pain after October 22, 2009. Plaintiff saw Dr. Santana of the Rochester General Medical Group/Newark

Medical Center on December 15, 2010, for an exacerbation of her back pain without precipitating event. (T. at 418.) Plaintiff's medications were listed as Flexeril 10 mg. b.i.d., Ibuprofen, and Norco 5/325. *Id*. Norflex 100 mg. b.i.d. was added. *Id*. Upon examination, Plaintiff was found to have negative straight leg raising, motor 5/5 of knee foot extension flexion, and 2+ reflexes of knees and ankles and biceps. (T. at 419.) Plaintiff was diagnosed with chronic recurrent back pain and told to continue her present medications except for Flexeril and to add the Norflex. *Id*.

Plaintiff saw Dr. Daniel Alexander of the Finger Lakes Bone and Joint Center on May 2, 2011, complaining of lower back pain and pain radiating down her left leg. (T. at 433-34.) According to a report of the visit sent to Dr. Santana, Plaintiff had been seen for a further evaluation of her lower back pain. *Id*. They reported 5/5 strength, negative foot drop, negative clonus, deep tendon reflexes throughout, and mildly tender along the musculature of her lumbar spine on palpation. *Id*. Plaintiff claimed to have been through therapy, chiropractic, and epidurals with no relief. *Id*. The report referenced a radiology report that showed preserved disc spacing with a posterior narrowing of L5-S1. *Id*. Plaintiff was given a prescription for Medrol Dosepak and a prescription for physical therapy. *Id*.

**B.      Consultative Internal Medicine Examination by Dr. Harbinder Toor**

Dr. Toor examined Plaintiff on September 27, 2011. (T. at 440-43.) Dr. Toor noted that Plaintiff's chief complaint was a five year history of low back pain due to bulging discs, constant sharp pain at 10 out of 10 on the scale of 1 to 10 in the lower back, which radiated to her legs, primarily her left leg. (T. at 440.)   Plaintiff complained of difficulty with daily physical routine of standing, walking, squatting, standing, bending, and lifting. *Id*. Plaintiff reported that the pain

interfered with her daily routine.  *Id*.  Plaintiff denied any history of using street drugs as she had with Dr. Ransom.  *Id*.

Dr. Toor described Plaintiff's activities of daily living as dressing, child care, cooking and cleaning every day, doing laundry twice a month, showering every other day and bathing four times a month, watching TV, going out, and socializing with friends.  (T. at 441.)

Upon examination, Plaintiff appeared to be in moderate pain, with normal gait, difficulty with heel to toe walking, squat 20% of the full, normal stance, no assistive devices, no need for help changing for exam, able to rise from chair without difficulty, but difficulty in getting on and off the exam table.  Plaintiff's cervical spine showed full flexion, extension, and lateral flexion bilaterally and full rotary movement bilaterally.  (T. at 442.)   Plaintiff's lumbar spine showed forward flexion 20 degrees, extension 0 degrees, lateral flexion 20 degrees bilaterally, and rotary and supine bilaterally at 20 degrees.  *Id*.   Deep tendon reflexes were psysiologic and equal in upper and lower extremities, no sensory deficit was noted, and strength was 5/5 in the upper and lower extremities.  *Id.*

Dr. Toor concluded that Plaintiff had moderate limitation with standing, walking, squatting, or sitting for a long time, moderate to severe limitations with bending or heavy lifting, and that Plaintiff's pain interfered with her daily routine.  (T. at 443.)  Dr. Toor found Plaintiff's prognosis to be fair.  *Id*.

C.     **Plaintiff's Testimony**

Plaintiff testified that her back was one of the reasons she did not look for work after she left her job as cashier at the gas station in June of 2007.  (T. at 14.)  When asked what kinds of treatment she had for her back over the past year, Plaintiff responded that she had cortisone shots

in her back and physical therapy and nothing helped. *Id*. Plaintiff testified that the last shot she had was in the beginning of the year, and the relief from the shots generally last for only an hour or two. (T. at 16.) Plaintiff had not had any physical therapy for her back in the last six or eight months. *Id*.

According to Plaintiff, she had pain in her lower back every day from the time she woke up until she went to bed to the point where it hurt to sit or stand. (T. at 25.) She generally took a hot bath or shower in the evening to relieve the pain. *Id*. When her back hurt during the day, Plaintiff would lie down for about a half hour until the pain went away a little bit and she could get up and do things. (T. at 26.) Plaintiff testified that when she was driving back from her examination with Dr. Dinolfo, she had to stop a few times because of her back. (T. at 22.)

Plaintiff testified she took no medication for the pain because nothing helped, and nothing else helped to alleviate the pain. *Id*. Plaintiff tried to walk every day for about half a mile when her back allowed it, although she had to stop after half a mile. *Id*. Plaintiff testified to having the same problem after standing for a while and that she had to shift positions or stand up after sitting for a period of time. *Id*.

Plaintiff acknowledged that she took care of her own laundry, although her aunt helped her to carry it to the laundromat, and cleaned the house when needed, although it generally took her a full day to clean the house because after about an hour she would have to sit and rest for a while because of the bending. (T. at 23, 33.) Plaintiff also cooked meals. (T. at 27.) It generally took her about a half hour to cook a meal and sometimes she would have to lean against something or sit for a few minutes while cooking. *Id*.

**D**.     **ALJ's RFC Assessment Relevant to Plaintiff's Lumbar Disc Disease**

Plaintiff has challenged the ALJ's finding that she has the residual functional capacity to perform light work on the grounds that the language in Dr. Toor's report that Plaintiff had "moderate to severe limitations with bending or heavy lifting" was not sufficiently specific to provide any useful information about her capabilities.  (Dkt. 13 at 33.)  Plaintiff has relied upon Second Circuit case law finding that vague opinions by medical experts will not override the opinion of the treating physician, *see e.g., Burgess v. Astrue*, 537 F.3d 117, 128-29 (2d Cir. 2008), and district court case law finding that a consultative examining physician's opinion that a claimant had "moderate limitations in standing, walking, climbing, and lifting minor weights" was too vague to serve as a proper basis for an RFC.  *See Ubiles v. Astrue*, No. 11-CV-6340T (MAT), 2012 WL 2572772, at * 11, 2012 U.S. Dist. LEXIS 100826, at * 35 (W.D.N.Y. July 2, 2012).

The ALJ did not rely solely on Dr. Toor's opinion in finding that Plaintiff had the residual functional capacity to perform light work.  In fact, she gave Dr. Toor's opinion little weight because it was somewhat vague in that it did not quantify the degree of limitation present.  (T. at 75.)  The ALJ did conclude, however, that Dr. Toor's opinion indicated that exertional limitations secondary to Plaintiff's muscoskeletal impairments were present.  The ALJ further found that Dr. Toor's opinion was supported by diagnostic testing of Plaintiff's back as well as findings of tenderness of the lumbar spine.  *Id*.

The ALJ's Decision reveals that she considered and relied upon the medical records of Plaintiff's treating physicians regarding her lumbar spine and diagnostic testing in determining

Plaintiff's RFC. (T. at 70, 73-75.) The ALJ found that the medical evidence substantiated the presence of no more than moderate signs, symptoms, and limitations. (T. at 73.) She considered Plaintiff's February 3, 2009, MRI studies showing mild spondylosis or disc bulges at L4/5 and L5/S1 and no evidence of significant central canal or foraminal stenosis, and x-ray studies showing preserved disc space and remarkable only for posterior narrowing of L5/S1. (T. at 73-74.)

The ALJ also considered the various findings in Plaintiff's February 18, 2009, and September 10, 2009, records from the Columbia Greene Bone and Joint Center, October 15, 2009, evaluation of Dr. Andrejuk, December 15, 2010 records of Dr. Santana, and the records of Dr. Alexander's evaluation on May 2, 2011, all discussed above. (T. at 73-74.) The ALJ observed that the findings from those exams generally revealed that Plaintiff's complaints of lower back pain were unaccompanied by neurological symptoms, swelling, or gait disturbance; physical examination failed to demonstrate any restricted range of motion; she had the ability to heel toe walk; negative straight leg raising; and muscle strength 5/5 in all extremities. *Id*. The ALJ noted that there was no indication Plaintiff had regular and ongoing treatment for her back after October 15, 2009. (T. at 74.) She concluded that the medical evidence confirmed Plaintiff had required no more than infrequent, routine, conservative treatment for her lumbar disc disease; that she had few objective muscoskeletal abnormalities, and no evidence of accompanying neurological deficits. (T. at 73.) The ALJ also found that the record demonstrated that Plaintiff had not continued with regular back treatment after December of 2010. *Id*. Dr. Toor's evaluation indicated that Plaintiff was not taking any medication at the time of her examination. (T. at 440.)

The ALJ found that despite Plaintiff's complaints of subjective pain, Dr. Toor observed that her gait and stance were normal, she demonstrated no motor, sensory or reflex deficits, and that with regard to her back, her physical examination was remarkable only for diminished range of motion of the lumbar spine and positive straight leg raising in the sitting and supine positions at 20 degrees.  (T. at 75.)

The ALJ also found that the evidence and hearing testimony reflected that Plaintiff remained fairly independent in her personal care, meal preparation, household maintenance, shopping, child care, leisure activities and other daily ordinary tasks.  (T. at 68.)  In addition, she considered Plaintiff's testimony that she was not currently receiving treatment for her back, had her last cortisone injection at the beginning of 2012, had her last physical therapy six to eight months before the hearing, and that she did not take over the counter medications because they did not relieve her symptoms.  (T. at 69.)

The ALJ indicated that she had considered all of Plaintiff's symptoms and the extent to which they could be accepted as consistent with objective medical evidence and concluded that while Plaintiff's medically determinable back impairments would reasonably be expected to cause some of the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC.  (T. at 70.)

Based upon the foregoing, the Court finds no error in the ALJ's assessment of Plaintiff's disc disease.

## IX.    STEP 5 DETERMINATION

Plaintiff has challenged the ALJ's step 5 determination on the grounds that the ALJ

improperly relied upon the vocational expert's testimony. (Dkt. No. 13 at 36.) Because the Court is recommending remand with respect to the RFC relevant to Plaintiff's Major Depressive Disorder and Anxiety, the step 5 determination may need to be reexamined on remand and is therefore not addressed herein.

**WHEREFORE**, it is hereby

**RECOMMENDED** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[9] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: May 26, 2015
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[9] Sentence four reads "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g) (2005).